IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LARRY STEWART, | ) | CASE NO.  1:21-CV-00335-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

Plaintiff, Larry Stewart ("Plaintiff" or "Stewart"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In July 2019, Stewart filed applications for POD, DIB, and SSI, alleging a disability onset date of December 1, 2017 and claiming he was disabled due to COPD, hip, leg, and shoulder condition, depression, and asthma.  (Transcript ("Tr.") at 168, 209, 225, 245, 255.)  The applications were denied initially and upon reconsideration, and Stewart requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 168.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On July 27, 2020, an ALJ held a hearing, during which Stewart, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 2, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 168-80.)  The ALJ's decision became final on January 13, 2021, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On February 11, 2020, Stewart filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16-17.)  Stewart asserts the following assignments of error:

(1) The ALJ erred when he found that Mr. Stewart was capable of performing a range of light work activity when the record supports a finding that Mr. Stewart's reasonable complaints of pain limit him to sedentary work.

(2) The ALJ erred when he found that Mr. Stewart is capable of performing a significant number of jobs in the national economy when the vocational expert failed to provide accurate data regarding job numbers.

(Doc. No. 14 at 1.)

## II.      EVIDENCE

### A.      Personal and Vocational Evidence

Stewart was born in April 1967 and was 53 years-old at the time of his administrative hearing (Tr. 168, 179), making him a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  He has a limited education and is able to communicate in English.  (Tr. 179.)  He has past relevant work as a poultry farm worker and hard wood floor installer.  (*Id.* at 178.)

2

**B.**     **Relevant Medical Evidence[2]**

On December 30, 2017, Stewart went to the emergency room complaining of chest pain, nausea, vomiting, diarrhea, cough, fatigue, headaches, and wheezing for the past three days.  (Tr. 468.)  On examination, Caleb Harrell, M.D., found normal respiratory effort, wheezes but no rales, no tenderness, normal range of motion, and no edema.  (*Id.* at 470.)  Dr. Harrell noted Stewart had received a DuoNeb treatment, which had resolved Stewart's wheezing.  (*Id.*)  After the treatment, Stewart reported feeling much better.  (*Id.*)

On January 2, 2018, Stewart went to the emergency room with complaints of pain with breathing, pressure in his lower lung area, shortness of breath with cough, wheezing, and dizziness for the past six days.  (*Id.* at 445.)  Stewart reported vomiting briefly after a coughing episode.  (*Id.*)  On examination, Jeffrey Atkins, M.D., found expiratory wheezes bilaterally, tenderness in the area of chest pain, mild upper abdomen tenderness, normal range of motion, and no edema.  (*Id.* at 447.)  Stewart received an aerosol treatment, which resolved his shortness of breath and chest pain.  (*Id.*)  A chest x-ray revealed mild hyperinflation of the lungs and mild central peribronchial thickening.  (*Id.* at 462.)

On July 3, 2019, Stewart saw Jennifer Shockley, CNP, regarding his COPD, edema, right hip pain, and fatigue.  (*Id.* at 674-75.)  Stewart reported no recent exacerbations of his COPD but worsening hip pain that was causing difficulty walking and completing daily activities.  (*Id.*)  Shockley noted Stewart's fatigue was likely secondary to obstructive sleep apnea.  (*Id.* at 675.)  On examination, Shockley found no wheezing or rhonchi, although there was poor inspiration/expiration effort, mild 2+ pitting edema of the bilateral lower extremities, a right-sided limp, right hip weakness and tenderness, and reduced range of motion of the right hip.  (*Id.* at 679-80.)  Shockley recommended Stewart keep his legs elevated as much

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Stewart challenges only the ALJ's physical findings, the Court further limits its discussion of the evidence to Stewart's physical impairments.

as possible and eat a low sodium diet to help with the edema, and recommended he rest his hip as much as possible and use NSAIDs, ice, and heat to help with his hip pain.  (*Id.* at 674-75.)  Shockley further recommended smoking cessation and daily inhaler use for Stewart's COPD.  (*Id.* at 674.)

On August 16, 2019, Stewart saw Shockley for follow up.  (*Id.* at 683.)  Shockley noted Stewart's pulmonary function test revealed severe COPD and referred him to pulmonology.  (*Id.*)  Shockley again encouraged smoking cessation and ordered breathing treatments and a nebulizer.  (*Id.*)  Shockley also noted Stewart's worsening right hip pain and knee pain and ordered a cane at Stewart's request to help with safety and stability because of his difficulty walking.  (*Id.* at 684-85.)  Shockley recommended resting his joints as much as possible and avoiding overuse.  (*Id.* at 684.)  On examination, Shockley found diminished breath sounds, no wheezing or rhonchi, right-sided limp, tenderness of the right hip and knee, moderate pain with motion of the right hip and knee, no swelling of the hip or knee, and no edema. (*Id.* at 688.)

On August 30, 2019, Stewart saw Matthew Popa, M.D., for evaluation of his right hip and knee pain.  (*Id.* at 518.)  Stewart reported severe right hip pain that radiated down his right leg to his foot.  (*Id.*) Stewart reported some numbness and tingling in the foot as well.  (*Id.*)  Stewart told Dr. Popa he had not had any significant treatment, such as injections or physical therapy, and was taking ibuprofen for pain management.  (*Id.*)  Stewart denied using an assistive device.  (*Id.*)  On examination, Dr. Popa found mild trochanteric tenderness, pain with internal rotation impingement test, positive Stinchfield test, and decreased passive range of motion of the right hip.  (*Id.* at 519.)  Dr. Popa further found no significant tenderness, slight decreased sensation in the right L5 distribution, and passive range of motion from 0 to 100 degrees of the right knee.  (*Id.*)  A pelvic x-ray taken that day revealed bilateral hip osteoarthritis, right worse than left.  (*Id.* at 519-20.)  A right knee x-ray revealed no significant degenerative changes. (*Id.* at 519.)  Dr. Popa noted most of Stewart's symptoms were from radicular pain and referred him for

4

further evaluation by a spine specialist.  (*Id.* at 520.)  Dr. Popa opined, "He does have rather significant degenerative changes in the right hip and I do think that further treatment with replacement possible at some point in the future, is reasonable although I do think getting his other symptoms under control initially is more important."  (*Id.*)

On September 20, 2019, Stewart saw Shockley for follow up.  (*Id.* at 690.)  Stewart reported aching swelling of his right leg with associated numbness.  (*Id.* at 691.)  Stewart told Shockley his orthopedic doctor had prescribed a steroid dose pack to reduce swelling.  (*Id.*)  Shockley noted positive Homan's sign and that both calves measured 17 inches.  (*Id.*)  On examination, Shockley found diminished breath sounds, no wheezing or rhonchi, mild tenderness of the right calf, and no edema.  (*Id.* at 693-94.)  Shockley ordered an ultrasound of the lower extremities and advised Stewart to schedule a follow up visit if his edema was not resolved after the ultrasound.  (*Id.* at 690.)

On September 23, 2019, Stewart underwent a consultative psychological evaluation by James N. Spindler, M.S.  (*Id.* at 506-11.)  Stewart reported suffering from COPD, asthma, and chronic shoulder, right hip, back, and leg pain.  (*Id.* at 507.)  His only hospitalization was for an abscess.  (*Id.*)  Spindler noted Stewart walked with a cane and that Stewart reported it had been prescribed by his physician.  (*Id.* at 508.)

On September 24, 2019, Stewart saw Robert Berkowitz, M.D., for evaluation of his low back pain.  (*Id.* at 515-17.)  Stewart reported seeing Dr. Popa for his hip pain and that Dr. Popa said he would probably need a hip replacement, right and then left.  (*Id.* at 515.)  Stewart complained of low back pain for the past two years that went down his right leg into his foot.  (*Id.*)  Stewart reported his right foot had been swollen for two years, and also endorsed numbness and tingling.  (*Id.*)  Dr. Berkowitz noted Stewart's primary care physician had ordered an ultrasound as part of the work up of the swelling in Stewart's leg.  (*Id.*)  On examination, Dr. Berkowitz found no edema, normal gait, an ability to heel and

5

toe walk, decreased range of motion of the lumbar spine, tenderness in the lumbar spinal musculature, good strength, no instability, some swelling to the right lower extremity, a little bit of redness of the right lower extremity and ankle, pain with internal and external rotation of the bilateral hips, right worse than left, full range of motion of the knees, ankles, and toes bilaterally, negative straight leg raise, and normal coordination.  (*Id.* at 516.)  X-rays of the lumbar spine taken that day revealed some arthritic changes at the L5-S1 level and "a lot of severe arthritic changes in the bilateral hips."  (*Id.*)  Dr. Berkowitz diagnosed Stewart with lumbar radiculopathy and noted Stewart needed further work up.  (*Id.* at 517.)  Dr. Berkowitz ordered physical therapy, an EMG nerve study of the lower extremities, and an MRI of the lumbar spine. (*Id.*)

On November 1, 2019, Stewart underwent an EMG/nerve conduction study.  (*Id.* at 789.)  On examination, Ahmad Siddiqi, M.D., found intact sensation to pinprick in the bilateral lower extremities, 5/5 muscle strength in the lower extremities except for right hip flexion, which was limited by pain, and absent DTRs in the bilateral lower extremities.  (*Id.*)  The EMG study was abnormal with evidence of subacute to chronic right L5-S1 polyradiculopathy with active denervation and chronic left L5 radiculopathy without active denervation.  (*Id.*)

A November 2, 2019 MRI revealed mild disc bulging at the L3-4 and L4-5 levels with mild central canal narrowing at L4-5.  (*Id.* at 697-98.)  The MRI further revealed disc encroachment and narrowing of the neural foramen at the L4-5 and L3-4 level on the left and narrowing of the L5-S1 neural foramen on the left.  (*Id.* at 698.)

On November 15, 2019, Stewart saw Shockley for follow up.  (*Id.* at 699.)  Stewart reported no complaints at the time.  (*Id.* at 700.)  Shockley noted Stewart's edema was controlled.  (*Id.* at 699.)  On examination, Shockley found diminished breath sounds, no wheezing or rhonchi, no calf tenderness,

negative Homan's sign, and no edema.  (*Id.* at 703.)  Shockley noted a limping gait compensated on both sides and that Stewart was weight-bearing with a cane.  (*Id.*)

On November 27, 2019, Stewart saw Gerald Gaviak, P.A., for follow up of his lumbar MRI and EMG study.  (*Id.* at 790-91.)   On examination, Gaviak found no edema, normal gait with a one-point cane, an ability to heel and toe walk, decreased range of motion of the lumbar spine, tenderness of the lumbar spinal musculature, good strength, no instability, and some swelling of the lower aspect of the right calf.  (*Id.* at 791.)  After reviewing the results of the MRI and the EMG, Gaviak noted it was unclear why Stewart was experiencing pain and why the EMG was positive.  (*Id.*)  Gaviak recommended Stewart see pain management and get an L4-5 transforaminal injection, followed by an L5-S1 transforaminal injection, to see what is causing his pain.  (*Id.*)

On December 13, 2019, Stewart saw Shockley for follow up.  (*Id.* at 707.)   Stewart reported increased edema in the lower extremities, stiff legs in the morning, and skin changes to the lower extremities.  (*Id.*)  Shockley noted it was most likely intermittent claudication.  (*Id.*)  Regarding Stewart's leg swelling, Shockley wrote:

> The severity is moderate and has worsened.  The patient denies any history of trauma.  Bilateral lower extremity swelling worsening despite use of Lasix and elevation; intermittent calf pain relieved with rest; skin changes noted to the lower extremities along with loss of hair.  The patient does not have erythema.  Previous diagnostic studies and/or treatments that have been performed/administered include radiographs (US negative).  The swelling is aggravated by exercise and walking but not aggravated by cold, heat, local pressure or standing.  The patient had a response to elevation and a response to rest.  The swelling is associated with skin discoloration.

(*Id.* at 708.)  On examination, Shockley found diminished breath sounds, no wheezing or rhonchi, 2+ pitting edema of the lower extremity, with skin color changes noted as the lower extremities were darker in color, as well as shiny skin and hair loss.  (*Id.* at 711.)  Shockley noted a non-antalgic, limping gait compensated on both sides and that Stewart was weight-bearing with a cane.  (*Id.*)

7

On January 3, 2020, Stewart saw pain management doctor Charles Choi, M.D., regarding his back and right hip pain.  (*Id.* at 806.)  On examination, Dr. Choi found "markedly limited" range of motion of the lumbosacral spine, positive facet joint provocative maneuver, some swelling of both legs, right worse than left, and range of motion of the hip joint worse on the right that was "almost completely frozen on internal rotation and Patrick's test as well."  (*Id.*)  Dr. Choi opined, "Clinically he has some problems of the lumbosacral spine with multiple level facet joint arthrosis, but primarily it is the right hip joint problem."  (*Id.*)  Dr. Choi ordered right hip injections under x-ray.  (*Id.* at 809-10.)  Dr. Choi also suggested Stewart return to an orthopedic surgeon for possible right hip replacement.  (*Id.* at 810.)

On January 14, 2020, Stewart saw Norman Sese, M.D., for a neurological consultation regarding Stewart's forgetfulness.  (*Id.* at 884.)  On examination, Dr. Sese found normal muscle bulk, tone, and strength, intact sensation, intact coordination, and normal gait.  (*Id.* at 886-87.)

On February 12, 2020, Stewart saw Kathy Dalzell, APRN-CNP, for follow up of right groin pain and low back pain.  (*Id.* at 812, 815.)  Stewart reported a recent fall because of gait instability due to groin pain and now his back was hurting.  (*Id.* at 815.)  On examination, Dalzell found decreased range of motion and decreased strength of the right hip, decreased range of motion and pain but no tenderness of the lumbar back, and limited internal and external rotation of the right hip.  (*Id.* at 815-16.)  Dalzell further found Stewart had an abnormal gait that was unsteady even with a cane and that Stewart had difficulty getting out of the chair.  (*Id.* at 816.)

On February 19, 2020, Stewart saw Dr. Berkowitz for his right groin and hip pain on referral by Dr. Choi.  (*Id.* at 792.)  On examination, Dr. Berkowitz found an antalgic gait, severe pain with internal/external rotation of the right hip, positive maneuvers for flexion, abduction, and external rotation, and negative straight leg raise.  (*Id.* at 793.)  X-rays taken that day revealed severe hip arthritis with joint space narrowing and marginal osteophyte.  (*Id.*)  Dr. Berkowitz diagnosed Stewart with severe

8

degenerative joint disease of the right hip.  (*Id.*)  Stewart wanted to proceed with a right total hip replacement.  (*Id.* at 794.)  Dr. Berkowitz noted, "I tried carefully to explain that the groin pain that was generating from his arthritis would be improved by hip replacement but I could not guarantee that all of his symptoms would be cured because he does have severe issues with his back and he seems to understand that."  (*Id.*)

On March 4, 2020, Stewart underwent a neuropsychological examination conducted by Richard Naugle, Ph.D.  (*Id.* at 897.)  Dr. Naugle noted Stewart walked slowly with a cane and had shortness of breath after walking from the waiting room to the exam room.  (*Id.* at 898.)  Stewart coughed intermittently and "appeared physically uncomfortable due to pain per his report and behaviors (e.g., grimaced and fidgeted)."  (*Id.*)

On May 18, 2020, Stewart underwent right total hip replacement surgery. (*Id.* at 630-36.)  Stewart was discharged to home health care with instructions that he could bear weight on his right hip as tolerated.  (*Id.* at 647-48.)

On June 9, 2020, Stewart saw Shockley for follow up from his right hip replacement and for the completion of disability paperwork.  (*Id.* at 727.)  Stewart complained of increased pain and swelling in his right leg and that he was walking with a cane.  (*Id.*)  Stewart also reported all over joint pain.  (*Id.*)  Shockley wrote:

> There is significant swelling in the right leg.  Discussed with him that this can be common after surgery he had.  Per patient he is moving around as he was told; elevates the leg; he is doing "foot pumps" and he has been wearing his compression stockings but the swelling continues to get worse.  He denies worsening SOB or CP at this time.  Patient is to have PT on the 11th.  Per patient he has not let ortho know about the pain in the leg or increase swelling. Have advised him to do so.  Patient only taking ASA BID for dvt prophylaxis per ortho orders.

(*Id.*)  Shockley ordered ANA and RA tests, an ultrasound to rule out a blood clot, and ordered a functional capacity test.  (*Id.* at 730.)

9

On June 26, 2020, Stewart underwent a functional capacity evaluation. (*Id.* at 867.) Stewart reported he had undergone a right hip replacement in March 2020, and he was still receiving physical therapy for his hip. (*Id.*) Pat Carey, PT, noted Stewart was breathing heavily even while sitting quietly. (*Id.*) On examination, Carey found reduced range of motion of the upper and lower extremities, although strength testing ranged from 4-5/5. (*Id.* at 868.) Carey noted a lifting test was deferred because of Stewart's recent hip surgery and his footwear (slides). (*Id.* at 869.) Carey determined Stewart was limited to sedentary work. (*Id.*) However, Carey noted Stewart currently was unable to work, especially regarding standing and lifting tasks, as he was still recovering from his total hip replacement. (*Id.* at 870.) Carey recommended Stewart continue with his therapy to strengthen his right hip and undergo another functional capacity evaluation at a later time to determine his ability to work. (*Id.*)

On July 9, 2020, Stewart saw Vagesh M. Hampole, M.D., for an initial evaluation of his joint pain and stiffness. (*Id.* at 871.) On examination, Dr. Hampole found diminished breath sounds, slightly decreased range of motion of the cervical spine but no pain, good range of motion of the shoulders with some pain, good range of motion of the elbows, wrists, and hands with no acute pain, present right THR, decreased range of motion of the left hip with pain, "ok" range of motion of the ankles and feet with no pain, and 1 to 2+ pitting edema of the legs, ankles, and feet. (*Id.* at 872.) Dr. Hampole ordered blood work and directed Stewart to continue taking Tylenol and Motrin for pain. (*Id.*)

On August 4, 2020, Stewart saw Dr. Hampole for follow up. (*Id.* at 914.) On examination, Dr. Hampole found diminished breath sounds, slightly decreased range of motion of the cervical spine but no pain, good range of motion of the shoulders with some pain, good range of motion of the elbows, wrists, and hands with no acute pain, present right THR, decreased range of motion of the left hip with pain, "ok" range of motion of the ankles and feet with no pain, and 1 to 2+ pitting edema of the legs, ankles, and feet.

(*Id.* at 915.)  Dr. Hampole directed Stewart to continue his current medications and follow up in three months.  (*Id.*)

On July 31, 2020, CNP Shockley completed a Medical Source Statement.  (*Id.* at 905-907.) Shockley reported that Stewart had COPD, intermittent claudication, osteoarthritis in multiple joints, chronic lower extremity edema, memory issue, mixed hyperlipidemia, and autoimmune disorder.  (*Id.* at 905.)  Stewart's symptoms include chronic pain, joint instability, mobility issues, chronic shortness of breath with exertion, lower extremity edema, fatigue, difficulty with standing and walking for too long, joint pain, and joint swelling.  (*Id.*)  Shockley opined Stewart could only walk small distances without getting short of breath and needing rest.  (*Id.*)  When in Shockley's office, he could walk approximately six feet and then got short of breath and needed to rest.  (*Id.*)  Per Stewart's functional capacity test, Shockley limited Stewart's standing and walking to less than two hours in an eight-hour workday and sitting to about four hours in an eight-hour workday.  (*Id.* at 906.)  Shockley estimated that, in a work situation, Stewart would be off-task over 25% of the day.  (*Id.* at 907.)  Shockley opined Stewart was "not suitable to work 8 hours [a] day."  (*Id.*)  Shockley reported her concern with Stewart working was not just with his function but also his breathing issues, as overexertion worsened Stewart's breathing.  (*Id.*)

C.    **State Agency Reports**

On October 28, 2019, Yeshwanth Bekal, M.D., opined Stewart was capable of lifting 20 pounds occasionally and 10 pounds frequently, standing/walking six hours in an eight-hour workday, and sitting for six hours in an eight-hour workday.  (*Id.* at 220, 236.)  Stewart could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, frequently stoop, and occasionally kneel, crouch, and crawl.  (*Id.* at 220-21, 236-37.)  Stewart must avoid concentrated exposure to hazards. (*Id.* at 221, 237.)

On February 17, 2020, on reconsideration, Indira Jasti, M.D., affirmed Dr. Bekal's findings.  (*Id.* at 251-252, 261-62.)

**D.     Hearing Testimony**

During the July 27, 2020 hearing, Stewart testified to the following:

- He did not complete high school.  (*Id.* at 189.)  He did not finish the 11th grade and did not later get his GED.  (*Id.*)

- He was scheduled to have hip surgery in March 2020, but it was postponed because of COVID.  (*Id.* at 191.)  He underwent hip surgery in May 2020 and was still in physical therapy.  (*Id.*)

- He smokes six cigarettes a day.  (*Id.* at 192.)  He is a recovering alcoholic and drug addict and has been sober for four years.  (*Id.* at 192-93.)  He last used marijuana a few months ago.  (*Id.* at 193-94.)

- His most severe problems are his mind and his right leg.  (*Id.* at 194.)  Three years ago, his right leg began swelling and it continues to swell.  (*Id.*)  His doctors need to try to fix his nerve to figure out why his leg swells.  (*Id.*)

- On a typical day, he wakes up and does his nebulizer right away.  (*Id.*)  He sits for a while and then he has to get up and walk around.  (*Id.*)  It is a constant struggle during the day between sitting and getting up to stretch his legs.  (*Id.*)  He may go outside to walk a little bit, but it is hard for him to get moving.  (*Id.* at 194-95.)

- Even after his hip surgery, he still gets a pulling sensation in his groin.  (*Id.* at 195.)  His leg swelling is also an issue, and his doctors have ordered more rehab for him.  (*Id.*)

- He uses a cane all the time.  (*Id.* at 196.)  He has been using the cane for almost a year.  (*Id.*)  He uses a walker for long distances, like if he has to go to a doctor's appointment.  (*Id.*)

- After he fully recovers from his right hip surgery, his doctors want to determine what is going on with his right leg and lower back and try to fix his nerve.  (*Id.*)  After that, he will have surgery on his left hip.  (*Id.*)

- His right leg started swelling in October or November 2017.  (*Id.*)  He takes medication for the swelling, but it doesn't seem to help.  (*Id.* at 198.)  He elevates his legs to above heart level every time he sits or lays down.  (*Id.* at 198-99.)  He has constant throbbing, pinching pain in his leg.  (*Id.* at 199.)  His leg stays red, and sometimes it gets purplish and hot.  (*Id.*)  He is on pain medication, which makes him sleepy.  (*Id.*)

12

- He can stand for ten minutes and then he needs to sit for a while.  (*Id.* at 197.)  He can sit for 20-30 minutes if he gets comfortable enough.  (*Id.* at 197-98.)  He could occasionally lift five to seven pounds.  (*Id.* at 198.)

The ALJ ruled out past work because the RFC would not come up to the medium level of exertion.

(*Id.* at 203.)  The ALJ then posed the following hypothetical question:

> Consider a person of the same age, education and work background as Mr. Stewart.  This person can lift/carry 20 pounds occasionally, ten pounds frequently, can stand/walk six out of eight, can sit six out of eight.  No limit on push/pull, but foot pedal is only occasional, and that's with the bilateral lower extremities.  This person can occasionally use a ramp or a – or stairs, but never a ladder, rope or a scaffold, can frequently balance, frequently stoop, occasionally kneel, crouch and crawl.  There are no manipulative limitations, no visual deficits, no communication deficits.  This person must avoid entirely dangerous machinery and unprotected heights, and additionally can do simple, routine tasks, no complex tasks.  And the tasks should be low stress, and I define that to mean no high production quotas or piece-rate work, and that's it.

(*Id.* at 204.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as parking lot cashier, housekeeping cleaner, and merchandise marker.  (*Id.* at 204-05.)  The ALJ reduced standing and walking to four hours out of eight, and the VE testified that while the parking lot cashier and merchandise marker positions would remain, the numbers for the merchandise marker would be reduced.  (*Id.* at 205.)  The hypothetical individual could also perform the job of ticket seller.  (*Id.*)

Stewart's counsel asked the VE what the impact would be if the hypothetical individual needed to occasionally elevate their legs above their heart.  (*Id.*)  The VE testified such a limitation would eliminate all competitive work.  (*Id.* at 205-06.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

13

determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment

14

does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Stewart was insured on his alleged disability onset date, December 1, 2017, and remains insured through December 31, 2022, his date last insured ("DLI").  (Tr. 168.)  Therefore, in order to be entitled to POD and DIB, Stewart must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.    The claimant has not engaged in substantial gainful activity since December 1, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease; osteoarthritis; chronic obstructive pulmonary disease (COPD); obesity; major depressive disorder; and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk for up to six hours and sit for up to six hours in an eight-hour work day; no limit on push/pull; occasionally use foot pedals with the bilateral lower extremities; occasionally climb ramps and stairs but never ladders, ropes, and scaffolds; frequently balance and stoop; occasionally kneel, crouch, and crawl; he must avoid all exposure to dangerous moving machinery and unprotected heights; he has no, [sic] manipulative visual, or communication deficits; he is limited to simple, routine tasks; and the tasks should be low stress defined as no high production quotas or pace grade work.

15

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on April **, 1967 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))

(Tr. 170-180.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

16

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

17

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his first assignment of error, Stewart asserts the ALJ erred in his credibility assessment, as the ALJ failed to consider the record evidence regarding Stewart's chronic lower extremity edema, low back and left hip pain, radiculopathy, and COPD, all of which supported Stewart's testimony.  (Doc. No. 14 at 12-16.)  Stewart further asserts that the failure to consider this evidence resulted in the ALJ's failure to "'build an accurate and logical bridge between the evidence and the result.'"  (*Id.* at 16.)  Stewart also argues the ALJ erred in his assessment of CNP Shockley's opinion, as the ALJ's reason for discounting her opinion – Stewart's recent hip surgery – was inadequate as it did not address Shockley's statements in her opinion regarding Stewart's breathing issues.  (*Id.* at 15.)

The Commissioner responds that substantial evidence supports the ALJ's RFC findings.  (Doc. No. 16 at 9.)  The Commissioner asserts that the ALJ "acknowledged" Stewart's COPD, musculoskeletal impairments, and edema, but weighed the evidence supporting disability against evidence supporting a no disability finding.  (*Id.* at 9-10.)  The Commissioner argues the ALJ properly discounted CNP Shockley's opinion, and notes that Stewart fails to challenge the ALJ's finding the opinions of the state agency reviewing physicians persuasive.  (*Id.* at 11-13.)

In his reply, Stewart maintains that the evidence cited by the ALJ in support of his findings regarding CNP Shockley's opinion were supportive of, not inconsistent with, CNP Shockley's opinion. (Doc. No. 17 at 2.)

18

Since Stewart's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5); 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly

considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion."

*Id.*

> The ALJ analyzed CNP Shockley's opinion as follows:

> > I find the opinions of Jennifer Shockley, CNP, and Pat Carey, P.T. to be unpersuasive (Exhibit 19F). Following a functional capacity evaluation performed on June 26, 2020, their opinion included that the claimant can sit a total of four hours in a workday, stand a total of one hour in a workday, lift and carry only up to five pounds, occasionally stoop bend, and reach, and never balance or kneel (Exhibit 16F:6, 19F:7-8). Ms. Shockley cited to the results of the functional capacity evaluation on July 31, 2020, and added additional significant additional limitations including that the claimant would be off task 25 percent of the day or more (Exhibit 19F:1-3). Initially, I note that the functional capacity evaluation was performed a little over two months following the claimant's total hip replacement that occurred on May 18, 2020 (Exhibit 10F:25-27, 19F:4). Furthermore, these two providers further noted that the limitations were related to the claimant still healing from his total hip replacement, acknowledging the poor support for their assessment during the claimant's current condition (Exhibit 19F:8). While the objective signs demonstrated a degree of worsening prior to the surgery, the procedure was meant to address the developed antalgic gait and return him to better performance. The prior observation of normal strength and normal coordination supports that there is a base level of adequate performance to which the claimant can be expected to return that is inconsistent with these opinions. Diagnostic imagery also supports an expectation of improvement. Specifically, an x- ray following the right hip arthroplasty procedure revealed expected postoperative findings including intact hardware (Exhibit 10F:18). An additional x-ray performed on June 27, 2020, revealed a hip replacement in good alignment with no signs of fracture, dislocation, or other bony abnormality (Exhibit 11F:54). As such, I find these opinions unpersuasive.

(Tr. 177.)

> The Court finds the ALJ erred in his evaluation of CNP Shockley's opinion.  It is clear the ALJ discounted CNP Shockley's opinion because it relied on the FCE done two months after Stewart's right hip replacement.  (*Id.*)  However, Shockley listed COPD, intermittent claudication, and lower extremity edema as some of Stewart's diagnoses.  (*Id.* at 905.)  Stewart's symptoms included "chronic shortness of breath with exertion," "LE edema," and "wheezing with COPD exacerbation."  (*Id.*)  In response to a question about how far Stewart could walk without rest, Shockley wrote, "Pt can only walk small

distances without getting short of breath and needing rest; in office approx 6 feet and short of breath and needing to rest."  (*Id.*)  That answer did not rely on the FCE done two months after Stewart's hip surgery and was solely focused on Stewart's breathing.  In addition, Shockley noted, "My concern with work is not only with function but also with his breathing issues.  Over exertion worsens his breathing."  (*Id.* at 907.)  In the FCE, PT Carey noted, "It is noted here that even sitting quietly, he breathes quite heavily. His resting heartrate was 89, O2 99."  (*Id.* at 908.)  Shockley opined that Stewart's symptoms would cause him to be off task 25% of the time.  (*Id.* at 907.)  While the Commissioner argues that Shockley's statement about Stewart's breathing was tied to her opinion that he was unable to work an eight-hour day – an opinion that went to a conclusion reserved to the Commissioner and that the ALJ was not required to consider – the ALJ did not so state.  Furthermore, it is possible to read Shockley's opinion regarding time off task as including Stewart's breathing symptoms, and in absence of any explanation by the ALJ, the Court cannot say the ALJ adequately explained his rejection of CNP Shockley's opinion.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White*, 572 F.3d at 281; *Bowen*, 478 F.3d at 746 ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning.  Here, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusions in his evaluation of CNP Shockley's (and PT Carey's) opinion.  As a result, the ALJ's decision must be VACATED AND REMANDED for proper articulation regarding this opinion.

As this matter is being remanded for further proceedings consistent with this opinion, and in the interests of judicial economy, the Court will not address Stewart's remaining assignments of error.

## VII.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is decision is VACATED AND REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**

Date: March 2, 2022                              *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

23